**NO. 26-20028**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**IN THE MATTER OF SANDRIDGE ENERGY, INCORPORATED,**
**Debtor**

**SANDRIDGE ENERGY INCORPORATED,**
**Appellant**

**v.**

**BEAZLEY INSURANCE COMPANY, INCORPORATED;**
**OLD REPUBLIC INSURANCE COMPANY,**
**Appellees**

---

On Appeal from the United States District Court for the Southern District of Texas, Houston Division, Case No. 4:25-CV-2650, Hon. Kenneth M. Hoyt

---

# BRIEF OF APPELLANT

---

**HAYNES AND BOONE, LLP**

Patrick L. Hughes
Natasha Breaux
Shayna G. Proler
1221 McKinney St., Ste. 4000
Houston, Texas 77010
Phone: (713) 547-2000

David P. Bender, Jr.
Martha Wyrick
6000 Headquarters Dr., Ste. 200
Plano, Texas 75024
Phone: (972) 739-6900

Counsel for Appellant

# CERTIFICATE OF INTERESTED PARTIES

Number and Style of Case: 26-20028; In the Matter of SandRidge Energy, Incorporated, Debtor. SandRidge Energy, Incorporated, Appellant v. Beazley Insurance Company, Incorporated; Old Republic Insurance Company, Appellees.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## I. Appellant/Debtor

SandRidge Energy, Inc.

SandRidge Energy, Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

*Counsel:*

Patrick L. Hughes
Natasha Breaux
Shayna G. Proler
HAYNES AND BOONE, LLP
1221 McKinney St., Ste. 4000
Houston, Texas 77010

David P. Bender, Jr.
Martha Wyrick
HAYNES AND BOONE, LLP
6000 Headquarters Dr., Ste. 200
Plano, Texas 75024

## II. Appellees

Beazley Insurance Company, Inc.
Old Republic Insurance Company

On October 20, 2025, in the district court, Beazley Insurance Company, Inc. certified that it is wholly owned by Beazley Holdings, Inc. and its ultimate parent company is Beazley plc, which is a publicly held company that is traded on the London Stock Exchange, and that no publicly held corporation holds 10% or more of Beazley plc's stock. ROA.15153.

On October 20, 2025, in the district court, Old Republic Insurance Company certified that it is a wholly owned subsidiary of Old Republic Specialty Insurance Group, Inc., which is a wholly owned subsidiary of the publicly traded company Old Republic International Corporation, and that no publicly held corporation holds 10% or more of the Old Republic International Corporation's stock. ROA.15153.

*Counsel:*

Jason L. Boland
Julie G. Harrison
NORTON ROSE FULBRIGHT US LLP
1550 Lamar St., Ste. 2000
Houston, Texas 77010

David T. Kearns
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Ste. 100
Washington, D.C. 20001

*/s/ Patrick L. Hughes*
Patrick L. Hughes

***Attorney of record for Appellant SandRidge Energy, Inc.***

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument to explain the important bankruptcy issues that this case raises, including that the result below (1) unduly favors the insurance industry at the expense of other creditor groups by allowing circumvention of the bankruptcy discharge of prebankruptcy claims, which is antithetical to the principle that similarly situated creditors should be treated equally, (2) enables insurers' derivative reimbursement claims arising under non-executory, expired, prebankruptcy contracts that are incapable of assumption to survive bankruptcy unaffected, based on the debtor's assumption of indemnity contracts with insider non-debtors to which the insurers are not parties, and (3) exposes post-bankruptcy reorganized companies to untold revival of claims previously understood to be discharged, which is categorically at odds with the fresh start of bankruptcy policy. Oral argument can also help the Court navigate the bankruptcy concepts underpinning the conflicting paths taken by the lower courts in denying relief.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES .................................................. i

STATEMENT REGARDING ORAL ARGUMENT ........................................ iii

TABLE OF CONTENTS .......................................................................... iv

TABLE OF AUTHORITIES ...................................................................... vii

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES .................................................................. 1

STATEMENT OF THE CASE ..................................................................... 2

I. In 2012, SandRidge purchased insurance policies for its directors and officers that covered claims made from 2012 through 2013. .......................................................... 2

II. SandRidge and its directors and officers were named as defendants in Securities Lawsuits, triggering coverage under the 2012 Policies. .......................................................... 3

III. In 2016, SandRidge entered and exited bankruptcy with a plan for a fresh start. .......................................................... 4

IV. Although the Insurers knew about the Securities Lawsuits and the bankruptcy, they did not participate in the bankruptcy process. .......................................................... 7

V. Years after the bankruptcy, the Insurers brought a reimbursement claim against SandRidge based on the 2012 Policies, seeking the $17 million they paid to settle Bennett and Grubb's liability in the Securities Litigation. .......................................................... 8

VI. SandRidge asked the lower courts to enforce the Plan against the Insurers because their reimbursement claim is barred by the Plan. .......................................................... 10

SUMMARY OF THE ARGUMENT ........ 11

STANDARD OF REVIEW ........ 15

ARGUMENT ........ 17

I. The Plan bars the Insurers' Claim because it is a "Claim" that the Plan discharged and enjoined, and no exception based on assumption applies. ........ 17

A. The Plan discharged and enjoined "Claims," and the Insurers' Claim is a "Claim." ........ 17

B. SandRidge did not assume the 2012 Policies, which give rise to the Insurers' Claim ........ 21

1. Under the Plan's plain language, SandRidge assumed D&O policies that were executory and unexpired only. ........ 21

2. SandRidge did not assume the 2012 Policies because they were not executory. ........ 23

3. SandRidge also did not assume the 2012 Policies because they expired years before the bankruptcy. ........ 31

4. The Confirmation Order and Plan did not determine whether any particular D&O policy, such as the 2012 Policies, were assumed. ........ 33

C. Assumption of the indemnification obligations is irrelevant here. ........ 39

D. Because the Plan bars the Insurers' Claim, the bankruptcy court should have reopened the bankruptcy case to enforce the Plan. ........ 47

II. The Plan also bars the Insurers' Claim because it is a "Section 510(b) Claim" that the Plan independently canceled and released. ..... 48

A. The Plan canceled and released "Section 510(b) Claims," and the Insurers' Claim is a "Section 510(b) Claim." ..... 49

B. Assumption of the indemnification obligations is irrelevant here. ..... 53

C. Because the Plan bars the Insurers' Claim, the bankruptcy court should have reopened the bankruptcy case to enforce the Plan. ..... 58

III. Alternatively, if the bankruptcy case is not reopened to enforce the Plan against the Insurers, SandRidge should be able to assert all its arguments in the Oklahoma State Case. ..... 59

CONCLUSION ..... 60

CERTIFICATE OF SERVICE ..... 62

ECF CERTIFICATION ..... 62

CERTIFICATE OF COMPLIANCE ..... 63

# TABLE OF AUTHORITIES

**Page(s)**

**<u>Cases</u>**

*Am. Home Assurance Co. v. Abrams*,
69 F. Supp. 2d 339 (D. Conn. 1999) ........................................................ 32

*Axis Reinsurance Co. v. HLTH Corp.*,
993 A.2d 1057 (Del. 2010) ........................................................ 56

*In re Baird*,
567 F.3d 1207 (10th Cir. 2009) ........................................................ 26, 28, 29

*Barnard Const. Co., v. City of Lubbock*,
457 F.3d 425 (5th Cir. 2006) ........................................................ 38, 57

*In re Bradley*,
501 F.3d 421 (5th Cir. 2007) ........................................................ 16

*In re Case*,
937 F.2d 1014 (5th Cir. 1991) ........................................................ 16, 19, 47

*Chandler v. Valentine*,
330 P.3d 1209 (Okla. 2014) ........................................................ 30

*In re Charge Enters., Inc.*,
2024 WL 5131141 (Bankr. D. Del. Dec. 16, 2024) ........................................................ 50, 51, 52, 53

*In re Davis Offshore, L.P.*,
644 F.3d 259 (5th Cir. 2011) ........................................................ 16

*DCV Holdings, Inc. v. ConAgra, Inc.*,
889 A.2d 954 (Del. 2005) ........................................................ 57

*In re Dorsey*,
870 F.3d 359 (5th Cir. 2017) ........................................................ 47

*In re Equalnet Commc'ns Corp.*,
2002 WL 31319332 (5th Cir. Sept. 30, 2002) ........................................................ 16

*In re Exide Techs.*,
378 B.R. 762 (Bankr. D. Del. 2007) .......... 36

*In re Falcon*,
44 F.4th 348 (5th Cir. 2022) .......... 24, 25, 26, 27, 28, 34

*In re German Pellets La., L.L.C.*,
91 F.4th 802 (5th Cir. 2024) .......... 20

*In re Goodrich Petrol. Corp.*,
894 F.3d 192 (5th Cir. 2018) .......... 19

*In re Greater Se. Comm. Hosp. Corp. I*,
327 B.R. 26 (Bankr. D.C. 2005) .......... 34

*Gulfport Energy Corp. v. FERC*,
41 F.4th 667 (5th Cir. 2022) .......... 23

*Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's London*,
656 A.2d 1094 (Del. 1995) .......... 29, 30

*In re HQ Glob. Holdings, Inc.*,
290 B.R. 78 (Bankr. D. Del. 2003) .......... 38

*In re Instant Brands Acquisition Holdings Inc.*,
170 F.4th 928 (5th Cir. 2026) .......... 15

*In re Intelogic Trace, Inc.*,
200 F.3d 382 (5th Cir. 2000) .......... 21

*ITG Brands, LLC v. Reynolds Am., Inc.*,
2017 WL 5903355 (Del. Ch. Nov. 30, 2017) .......... 57

*Lennar Corp. v. Markel Am. Ins. Co.*,
413 S.W.3d 750 (Tex. 2013) .......... 30

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
903 A.2d 728 (Del. 2006) .......... 32

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*,
68 A.3d 1208 (Del. 2012) .......... 56

*Med. Depot, Inc. v. RSUI Indem. Co.*,
2016 WL 5539879 (Del. Super. Ct. Sept. 29, 2016) ....30, 31, 32

*In re Mid-Am. Waste Sys., Inc.*,
228 B.R. 816 (Bankr. D. Del. 1999) .... 51

*Motorola Inc. v. Amkor Tech., Inc.*,
958 A.2d 852 (Del. 2008).... 57

*In re Mountain Express Oil Co.*,
674 B.R. 747 (Bankr. S.D. Tex. 2025) ....25

*In re MPF Holdings US LLC*,
701 F.3d 449 (5th Cir. 2012).... 55

*In re Nat'l Gypsum*,
208 F.3d 498 (5th Cir. 2000) ....44

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Willis*,
296 F.3d 336 (5th Cir. 2002) ....30

*Osborn ex rel. Osborn v. Kemp*,
991 A.2d 1153 (Del. 2010) .... 37, 56

*In re Pirani*,
824 F.3d 483 (5th Cir. 2016) .... 38, 39

*In re PRS Ins. Grp.*,
2003 WL 21262446 (Bankr. D. Del. May 30, 2003) ....39

*Republic Supply Co. v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) .... 21

*Resol. Tr. Corp. v. Ayo*,
31 F.3d 285 (5th Cir. 1994)....32

*In re Safety-Kleen Corp.*,
380 B.R. 716 (Bankr. D. Del. 2008)....38

*In re SeaQuest Diving, LP*,
579 F.3d 411 (5th Cir. 2009)....50, 51, 53

*In re Serta Simmons Bedding, L.L.C.*,
125 F.4th 555 (5th Cir. 2024) .......... 16, 45, 46

*In re Tex. Wyoming Drilling, Inc.*,
647 F.3d 547 (5th Cir. 2011) .......... 16, 34

*Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*,
2023 WL 2771509 (Del. Ch. Apr. 4, 2023) .......... 32

*In re Touch Am. Holdings, Inc.*,
381 B.R. 95 (Bankr. D. Del. 2008) .......... 51

*In re TransPerfect Glob., Inc.*,
2021 WL 1711797 (Del. Ch. Apr. 30, 2021) .......... 57

*In re Trevin*o,
535 B.R. 110 (Bankr. S.D. Tex. 2015) .......... 20

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010) .......... 37, 38

*In re Weinstein Co. Holdings LLC*,
997 F.3d 497 (3d Cir. 2021) .......... 24

**Statutes**

11 U.S.C. § 101 .......... 18, 19, 52

11 U.S.C. § 350 .......... 47

11 U.S.C. § 365 .......... 22, 23, 34, 37

11 U.S.C. § 502 .......... 5, 14, 49, 50

11 U.S.C. § 509 .......... 55

11 U.S.C. § 510 .......... *passim*

11 U.S.C. § 1123 .......... 24

11 U.S.C. § 1141 .......... 17, 18

28 U.S.C. § 158 .......... 1

28 U.S.C. § 1334 ........ 1

**Rules**

Fed. R. Civ. P. 60 ........ 38

**Other Authorities**

Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/unexpired ........ 33

Collier on Bankruptcy (16th ed. 2026) ........ 20, 22, 24, 25, 48

Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/unexpired ........ 33

*Expiration Date - When Coverage Officially Ends*, Total CSR, https://totalcsr.com/insurance-glossary/expiration-date/ ........ 33

Gary Lockwood, Law of Corporate Officers & Directors: Indemnification & Insurance (2nd ed. 2025) ........ 25

Hon. Joan N. Feeny & Michael J. Stepan, Bankruptcy Law Manual (5th ed. 2025) ........ 50

*Insurance Expiration Date Definition*, Hiscox, https://www.hiscox.com/glossary/insurance-expiration-date-definition ........ 33

*Insurance Terms & Definitions - Expiry Date*, Founder Shield, https://foundershield.com/insurance-terms/definition/expiry-date/ ........ 33

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/unexpired ........ 33

New Appleman on Insurance Law Library Edition (2026) ........ 29, 30

*What Does Expiration Date Mean?*, Insuranceopedia, https://www.insuranceopedia.com/definition/1826/expiration-date .......... 33

## STATEMENT OF JURISDICTION

The bankruptcy court had jurisdiction to determine Appellant's motions to reopen the bankruptcy case to enforce the bankruptcy plan under 28 U.S.C. § 1334(b). ROA.14423, 14435. The district court had jurisdiction to review the bankruptcy court's order denying those motions under 28 U.S.C. § 158(a)(1). ROA.15546-47. This Court has jurisdiction to review the lower courts' orders under 28 U.S.C. § 158(d). Appellant timely filed its notice of appeal on January 14, 2026, from the district court's December 16, 2025 order, which affirmed the bankruptcy court's order. ROA.15548-52.

## STATEMENT OF THE ISSUES

1. The lower courts' refusal to reopen the bankruptcy case to enforce the bankruptcy plan against the Insurers to prohibit them from pursuing their reimbursement claim is erroneous because the plan discharged and enjoined their claim and no exception exists based on assumption.

2. The lower courts' refusal to reopen the bankruptcy case to enforce the bankruptcy plan against the Insurers to prohibit them from pursuing their reimbursement claim is also erroneous because the plan canceled and released their claim as a Section 510(b) Claim.

3. Alternatively, if the refusal to reopen the bankruptcy case to enforce the bankruptcy plan against the Insurers was not erroneous, then SandRidge should be allowed to assert all its arguments in this federal court appeal in the Oklahoma State Case.

## STATEMENT OF THE CASE

Appellant SandRidge Energy, Inc. ("SandRidge"), an Oklahoma-based oil and gas producer, successfully emerged from bankruptcy nearly a decade ago under a reorganization plan that gave it a fresh start. ROA.1403, 7180-307. Years later, Appellees Beazley Insurance Company, Inc. and Old Republic Insurance Company (collectively, the "Insurers"), which provided prebankruptcy insurance coverage to SandRidge's directors and officers, seek to recover $17 million from SandRidge via a coverage reimbursement claim that predates the bankruptcy. ROA.10631-33, 10645-47, 10652.

### I. In 2012, SandRidge purchased insurance policies for its directors and officers that covered claims made from 2012 through 2013.

The relevant facts began in 2012, when SandRidge purchased liability insurance policies for its directors and officers ("D&Os"). Those D&O liability insurance policies were obtained from multiple insurance companies, including the Insurers who are appellees in this appeal, with the amounts of insurance stacked in tiers (collectively, the "2012 Policies"). ROA.10632, 10645-46, 13298. That type of

insurance structure is known as tower coverage. The Insurers' 2012 Policies adhered to the form of the lead policy in the tower, which was the CODA Premier Directors and Officers Liability Excess DIC Policy issued by Ace American Insurance Company. ROA.13298, 10455, 10461-62 & n.18.

The 2012 Policies had a policy period of February 28, 2012, to February 28, 2013, and were claims-made, "Side A" policies. ROA.13298, 13302, 10632, 10645-46. As claims-made policies, they provided coverage for claims first made during the policy period only. ROA.13298, 13302, 10646. As Side A policies, they provided coverage solely to non-debtor D&Os for claims made against the D&Os only; they did not provide coverage to SandRidge for claims made against SandRidge. ROA.13298, 13302-04, 13319, 10632. Under these policies, the D&Os were the "Insureds"—not SandRidge. ROA.13304, 13319, 10632.

## II. SandRidge and its directors and officers were named as defendants in Securities Lawsuits, triggering coverage under the 2012 Policies.

The D&Os were subjected to litigation by class-action plaintiffs asserting federal securities fraud claims against SandRidge and three of its D&Os (Matthew Bennett, James Grubb, and Tom Ward) in 2012 and relatedly in 2015 (the

"Securities Lawsuits").[1] ROA.1390, 1407-08, 10631, 10641-42, 13267. The Securities Lawsuits triggered insurance coverage for the D&Os under the 2012 Policies. ROA.10632. It is undisputed that the Insurers had notice of the Securities Lawsuits, accepted coverage of the D&Os in those lawsuits, and paid for the D&Os' defense costs in those lawsuits. ROA.10454-55, 10485.

## III. In 2016, SandRidge entered and exited bankruptcy with a plan for a fresh start.

Due to a substantial decline in oil and gas prices, SandRidge and its affiliates filed chapter 11 bankruptcy cases in May 2016. ROA.98-101, 1379-80, 1414-15, 7180. The bankruptcy automatically stayed the Securities Lawsuits. ROA.1407-08, 14411.

When filing the bankruptcy cases, the debtors also filed a proposed, pre-negotiated chapter 11 plan. ROA.475-83, 540-41. Thereafter, the debtors filed an amended plan (the "Plan"). ROA.7254-307. Bankruptcy Judge David Jones confirmed that Plan in September 2016 (the "Confirmation Order"). ROA.7180, 7207-08, 7252.

---

[1] The Securities Lawsuits are *Glitz v. SandRidge Energy, Inc.* (consolidated as *In re SandRidge Energy, Inc. Securities Litigation*), No. 5:12-cv-01341-LRW (W.D. Okla.) and *Duane & Virginia Lanier Trust v. SandRidge Energy, Inc.*, No. 5:15-cv-00634-M (W.D. Okla.).

The Plan gave SandRidge a fresh start by barring certain claims. For example, the Plan broadly discharged claims against SandRidge with a corresponding injunction prohibiting pursuit of those claims (absent certain exceptions). ROA.7295, 7297-98. The Plan also canceled and released "Section 510(b) Claims," defined in definition 127 of the Plan to include claims arising from the purchase or sale of a SandRidge security and reimbursement allowed under section 502 of the Bankruptcy Code on account of such claim, including the claims asserted against SandRidge in the Securities Litigation. ROA.7268, 7277. There was a narrow exception in the Confirmation Order applicable solely to the Securities Lawsuits' plaintiffs that allowed the plaintiffs to pursue those suits but only with SandRidge as a nominal defendant solely to the extent necessary to recover from insurance. ROA.7240-41 (§ KK.146(iv)).

The Plan dealt with SandRidge's contracts, too. Generally, for contracts that were executory (which essentially means that each party had a remaining material obligation that, if not performed, excused the other party's performance), SandRidge could decide whether to assume (meaning keep performing) or reject (meaning breach and walk away from) the contract after bankruptcy. *See* ROA.7284-88; *infra* pp.23-25. For D&O liability insurance policies specifically, SandRidge assumed only unexpired policies to the extent they were executory. ROA.7284.

SandRidge disclosed that it planned to assume 11,566 executory contracts and reject 99 executory contracts. ROA.12372-736, 13109-112. The 2012 Policies are not on those lists.

Separately, SandRidge chose to assume certain indemnification obligations to D&O insiders in employment contracts and SandRidge's organizational documents (its bylaws and articles of incorporation). ROA.7287 (Art. V.D); ROA.7263 (Art. I.A.65); *see, e.g.*, ROA.13361-79. Specifically, SandRidge assumed indemnification obligations owed to D&Os Bennett and Grubb "to the extent consistent with applicable law," while SandRidge rejected the indemnification obligations owed to D&O Ward. ROA.7287, 7244.

The Plan states that the rights, obligations, construction, and implementation of the Plan are governed by Delaware law, unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code. ROA.7271 (Art. I.D).

The Plan ultimately was designed to give SandRidge a fresh start by restructuring or relieving it from many claims and obligations, consistent with bankruptcy's fundamental purpose. *E.g.*, ROA.6721, 1384-96. As SandRidge's Chief Financial Officer testified at the Plan's confirmation hearing, SandRidge wanted "to have a fresh start, to make sure that [it] . . . emerge[d] from this process [without] further issues that will come back." ROA.6676, 6721.

## IV. Although the Insurers knew about the Securities Lawsuits and the bankruptcy, they did not participate in the bankruptcy process.

Throughout the bankruptcy case, the Insurers had numerous chances to participate, but they never did. The Insurers received multiple notices of the bankruptcy proceedings, including notice that the case was filed, that there was a deadline to file claims, and that the confirmation hearing was scheduled. Bankr. Case No. 16-32488, Doc. No. 179, pp. 1-2, 88, 165[2], 838-39; Doc. No. 495, pp. 2-3, 120, 204; Doc. No. 584, pp. 4, 264, 367. And from the outset of the bankruptcy through Plan confirmation, the Insurers also had notice that the Plan would discharge and enjoin claims, as well as cancel and release reimbursement claims defined as Section 510(b) Claims. *E.g.*, Bankr. Case No. 16-32488, Doc. No. 179, pp. 1-2, 88, 165; Doc. No. 482, pp. 58, 130, 213; ROA.475, 482, 491-96.

Despite receiving these notices and providing coverage in the Securities Litigation, the Insurers did nothing. For instance, they did not file claims, object to the disclosure statement or the Plan, object to the cancelation and release of reimbursement claims defined as Section 510(b) Claims, or challenge the Confirmation Order.

[2] Old Republic's notice party is Chicago Underwriting.

## V. Years after the bankruptcy, the Insurers brought a reimbursement claim against SandRidge based on the 2012 Policies, seeking the $17 million they paid to settle Bennett and Grubb's liability in the Securities Litigation.

Five years after SandRidge exited bankruptcy, the Insurers funded a $17 million settlement of the Securities Lawsuits against Bennett and Grubb under the 2012 Policies. ROA.10631-32, 10645-47.

Before the Insurers funded the settlement, Bennett and Grubb asked SandRidge to pay for the settlement amount based on indemnification obligations in SandRidge's organizational documents. ROA.10577-78. SandRidge declined based on various defenses it has to indemnification, and to confirm its rights, sought a declaratory judgment in Oklahoma state court that it is not obligated to indemnify Bennett and Grubb (the "Oklahoma State Case"). ROA.10196, 10207.

After the Insurers funded the settlement, they filed counterclaims against SandRidge in the Oklahoma State Case, seeking reimbursement from SandRidge for the full amount of the settlement based on the subrogation provision in the 2012 Policies (the "Insurers' Claim"). ROA.10621, 10631, 10646-47, 10652. Bennett and Grubb also filed counterclaims against SandRidge in their individual capacities, seeking indemnification based on the indemnification obligations in their employment contracts and SandRidge's organizational documents. ROA.10621, 10631, 10647-51.

In 2023, disputes arose over the impact of the Plan and Confirmation Order on some of SandRidge's defenses to Bennett and Grubb's indemnification claims in the Oklahoma State Case. *E.g.*, ROA.7539-42, 7559, 7625, 7629-30. Those disputes led the parties back to bankruptcy court to address issues related to the enforceability of SandRidge's indemnification obligations to Bennett and Grubb. *E.g.*, ROA.7539-42, 10369-70. Bankruptcy Judge Jones held that the assumption of the indemnification obligations under the Plan was a valid exercise of SandRidge's business judgment and that SandRidge is prohibited from challenging the assumption of the indemnification obligations. ROA.10370.[3]

Further, the bankruptcy court claimed exclusive jurisdiction to consider any matters concerning Plan violation and enforcement that may arise in the future (the "Gatekeeping Order"). ROA.10371.

[3] In this appeal, SandRidge is not challenging the assumption of the indemnification obligations, which the Plan states were assumed "to the extent consistent with applicable law." ROA.7244, 7287. In the Oklahoma State Case, SandRidge has pending non-bankruptcy-related defenses to Bennett and Grubb's indemnification claims that are consistent with applicable law. Those defenses are not at issue in this appeal.

## VI. SandRidge asked the lower courts to enforce the Plan against the Insurers because their reimbursement claim is barred by the Plan.

Nearly two years later in 2025, as the Oklahoma State Case was reinitiating, a new issue arose: whether the Plan bars the Insurers' Claim for reimbursement. That issue is unrelated to the prior proceedings, but the broad wording of the Gatekeeping Order created peril in pursuing that issue in the Oklahoma State Case.[4] To avoid being in contempt of the Gatekeeping Order, SandRidge filed a motion to enforce the Plan against the Insurers in bankruptcy court, requesting that the bankruptcy court prohibit the Insurers' Claim from proceeding because it is barred by the Plan. ROA.10420-45. As ministerial procedural relief incident to that substantive motion, SandRidge filed a related motion asking the court to administratively reopen the closed bankruptcy case to grant the substantive enforcement relief sought at the same time. ROA.10407-19. The motions were heard by Bankruptcy Judge Marvin Isgur, due to Bankruptcy Judge Jones' prior resignation. ROA.14435.

The bankruptcy court agreed with SandRidge that "if the Insurers are violating the [P]lan through their assertion of the [Insurers' Claim], good cause exists to reopen SandRidge's case for the purpose of enforcing the [P]lan."

---

[4] SandRidge has additional, non-bankruptcy-related defenses to the Insurers' Claim in the Oklahoma State Case. Those defenses are not at issue in this appeal.

ROA.14424. The bankruptcy court nonetheless denied the motions, concluding the Insurers' Claim did not violate the Plan because SandRidge assumed the 2012 Policies and the indemnification obligations to Bennett and Grubb, and assumption of the indemnification obligations had "primacy over" the cancelation and release of Section 510(b) Claims. ROA.14411, 14424-35.

The district court affirmed the denial of the motion to reopen the bankruptcy case but rejected the bankruptcy court's reasoning concerning the motion to enforce as "not relevant," not adopting it in the slightest. ROA.15546-47. Instead, the district court directed that all issues in this appeal should be raised and decided in the Oklahoma State Case, stating that a "decision not to reopen the Bankruptcy case does not impact the rights of the parties to resolve their differences in the Oklahoma case." ROA.15546.

The two courts below thus reached the same outcome on fundamentally different grounds. This appeal followed.

## SUMMARY OF THE ARGUMENT

The plain language of the Plan bars the Insurers' Claim against SandRidge in two independent ways—either of which is a ground for reversing and rendering judgment for SandRidge.

***First***, the Plan bars the Insurers' Claim because the Plan discharged and enjoined "Claims," and the Insurers' Claim is a "Claim" for which no exceptions apply. The Plan contains a broad discharge of all "Claims" against SandRidge of any nature whatsoever, whether known or unknown. The Plan also contains a corresponding injunction, which enjoins holders of "Claims" from pursuing actions against SandRidge in connection with those "Claims." A "Claim" is defined as a "right to payment." The Insurers' Claim for reimbursement of their payment constitutes a "Claim" that is subject to the discharge and injunction.

The Insurers contend that an exception to the discharge and injunction exists for their Claim because SandRidge assumed the 2012 Policies, which give rise to the Insurers' Claim. Not so. Under the Plan, SandRidge assumed only those D&O policies that were executory and unexpired. The 2012 Policies satisfy neither requirement: by the time of the bankruptcy in 2016, SandRidge had fully performed its obligations under the 2012 Policies rendering them non-executory, and as claims-made policies, they expired at the end of their policy period in 2013. The bankruptcy court misconstrued the plain language of the Plan and Confirmation Order when it held that they contain an automatic, blanket assumption of all D&O policies that precludes the court from first assessing whether any particular D&O policy, such as the 2012 Policies, were executory and unexpired.

The Insurers also attempt to circumvent the discharge and injunction based on SandRidge's assumption of indemnification obligations to third-parties Bennett and Grubb. But that assumption is irrelevant here. SandRidge seeks to enforce the Plan's bar of the Insurers' Claim. SandRidge does not contend that the Plan bars Bennett and Grubb's separate indemnification claims, which derive from the indemnification obligations in their employment contracts and SandRidge's organizational documents. The Insurers' Claim for reimbursement and Bennett and Grubb's claims for indemnification cannot be conflated, as they are different claims, held by different persons/entities, arising from different contracts. When the Plan discharged and enjoined the Insurers' Claim itself, the Insurers cannot evade that discharge and injunction by piggybacking onto the assumption of indemnity obligations to third parties in contracts to which the Insurers are not parties. The bankruptcy court's holding otherwise allows the Insurers an impermissible end-run around the Plan's discharge and injunction of their own claim.

***Second***, the Plan bars the Insurers' Claim because the Plan canceled and released "Section 510(b) Claims," and the Insurers' Claim is also a "Section 510(b) Claim" as defined. The Plan defines "Section 510(b) Claims" as "Claims against [SandRidge] arising from (a) rescission of a purchase or sale of a security of [SandRidge] or an Affiliate of [SandRidge], (b) purchase or sale of such a security,

or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, including the Claims asserted against [SandRidge] in [the Securities Lawsuits]." And the Plan unambiguously canceled and released all "Section 510(b) Claims." The Insurers' Claim, which seeks reimbursement for the payment it made under the 2012 Policies to settle the Securities Lawsuits, falls squarely within the plain definition of "Section 510(b) Claims" and thus was canceled and released. The Plan's cancelation and release of such securities claims reflects Congress' purposeful decision in section 510(b) of the Bankruptcy Code to mandate subordination of claims related to securities law violations to a priority below other creditors' claims.

The Insurers try to circumvent that cancelation and release based, once again, on the assumption of indemnification obligations owed by SandRidge to insider non-debtors Bennett and Grubb. The Court should reject the Insurers' circumvention attempt because it violates the plain language of the Plan that canceled and released the Insurers' own claim. Assumption of the indemnification obligations is irrelevant here.

Taking a step back, this dispute matters beyond the parties involved. Bankruptcy gives companies a fresh start. When a company exits bankruptcy, its bankruptcy plan bars claims, other than those specifically permitted to ride through

bankruptcy, so that the company can move on. If insurers or other prebankruptcy creditors can sidestep the discharge and make the company pay for claims that were barred, two key things go wrong. First, the company does not get the fresh start it was promised. Second, insurers with contingent and unliquidated reimbursement claims jump ahead of other creditors who follow the rules—which incentivizes inaction during the bankruptcy and treats insurers better than everyone else.

Because the Plan bars the Insurers' Claim—either due to the discharge and injunction, or the cancelation and release—the bankruptcy court erred in refusing to reopen the bankruptcy case to enforce the Plan against the Insurers. This Court should reverse and prohibit the Insurers from pursuing their barred, prebankruptcy reimbursement claim.

## STANDARD OF REVIEW

"[The Court's] review is properly focused on the actions of the bankruptcy court." *In re Instant Brands Acquisition Holdings Inc.*, 170 F.4th 928, 932 (5th Cir. 2026). "Although [the Court] may 'benefit from the district court's analysis of the issues presented, the amount of persuasive weight, if any, to be accorded the district court's conclusions is entirely subject to [the Court's] discretion.'" *Id.* (citation omitted). As in the district court, the bankruptcy court's "conclusions of law and

mixed law and fact questions are reviewed *de novo*, while findings of fact are reviewed for clear error." *In re Bradley*, 501 F.3d 421, 428 (5th Cir. 2007).

This appeal turns on the interpretation of the unambiguous, confirmed Plan, which is a conclusion of law reviewed *de novo*. *In re Davis Offshore, L.P.*, 644 F.3d 259, 263 (5th Cir. 2011) ("This Court interprets the terms of a bankruptcy reorganization plan and confirmation order *de novo* and holistically."); *In re Equalnet Commc'ns Corp.*, 2002 WL 31319332, at *1-2 (5th Cir. Sept. 30, 2002) (holding that the "interpretation of a court order is ultimately a legal question" that is reviewed *de novo*, and no deference is owed to the bankruptcy court's interpretation unless the order is "truly ambiguous"); *In re Tex. Wyoming Drilling, Inc.*, 647 F.3d 547, 550 (5th Cir. 2011) ("The res judicata effect of a prior judgment is a question of law that we review *de novo*.").

Ultimately, "[o]n review of a confirmed plan, [the Court] may 'fashion whatever relief is practicable' for the benefit of appellants." *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 593 (5th Cir. 2024) (citation omitted). The Court reviews decisions on reopening bankruptcy cases for abuse of discretion. *In re Case*, 937 F.2d 1014, 1018 (5th Cir. 1991).

## ARGUMENT

### I. The Plan bars the Insurers' Claim because it is a "Claim" that the Plan discharged and enjoined, and no exception based on assumption applies.

First, the Insurers' Claim is barred by the Plan provisions that discharge and enjoin "Claims." The Insurers are incorrect that an exception based on assumption applies. SandRidge did not assume the 2012 Policies, which give rise to the Insurers' Claim. And SandRidge's separate assumption of indemnity obligations to Bennett and Grubb is irrelevant here. Because the Plan bars the Insurers' Claim, the bankruptcy court erred in refusing to reopen the bankruptcy case and enforce the Plan against the Insurers.

#### A. The Plan discharged and enjoined "Claims," and the Insurers' Claim is a "Claim."

Like many bankruptcy plans, the Plan here provided a broad discharge and injunction against the pursuit of Claims against SandRidge (absent exceptions elsewhere in the Plan).

The section of the Plan entitled "*Discharge of Claims and Termination of Interests*" states this discharge of Claims against SandRidge:

> Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan . . . , the distributions, rights, and treatment that are provided in the Plan ***shall be in complete satisfaction, discharge, and release***, effective as of the Effective Date, ***of Claims*** . . . , Interests, and Causes of Action ***of any nature whatsoever***, . . . ***whether known or unknown***, against, liabilities of,

> Liens on, obligations of, rights against, and Interests in, [SandRidge] or any of [its] assets or properties, . . . including demands, liabilities, and Causes of Action that arose before the Effective Date . . . . The Confirmation Order shall be a judicial determination of the ***discharge of all Claims*** and Interests subject to the Effective Date occurring.

ROA.7295 (Article VIII.B) (emphases added). Section 1141(d) of the Bankruptcy Code, referenced by the Plan, similarly provides that "the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation" (absent certain exceptions). 11 U.S.C. § 1141(d)(1)(A). "Debt" means "liability on a claim." 11 U.S.C. § 101(12).

The Plan further reinforces the protection against pursuit of a discharged claim by permanently enjoining holders of Claims from pursuing actions against SandRidge in connection with those Claims, under a section of the Plan entitled "*Injunction*":

> Except as otherwise expressly provided in the Plan . . . , ***all Entities***[5] ***who have held, hold, or may hold Claims*** or Interests ***that have been . . . discharged*** pursuant to Article VIII.B of the Plan . . . ***are permanently enjoined***, from and after the Effective Date, from taking any of the following actions against, as applicable, [SandRidge] . . . : (a) ***commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims*** or Interests; . . . and (e) commencing or continuing in any manner any action or other proceeding of any kind on

[5] The Insurers are "Entities." *See* ROA.7262 (Art. I.A.47); 11 U.S.C. §§ 101(15), (41).

> account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

ROA.7297-98 (Art. VIII.H) (emphases added). The Confirmation Order, which confirms the Plan in its entirety, emphasizes that "[t]he injunction provisions set forth in Article VIII.H of the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the discharge . . . ." ROA.7197, 7207-08, 7215-16.

A broad discharge and injunction of Claims effectuates a key purpose of bankruptcy: giving the debtor a "fresh start," which allows debtors to move forward "unburdened by past failures." *Case*, 937 F.2d at 1024. As this Court has observed, creditors "often do not receive the full amount of their claims; however, this is a feature, not a flaw, of the design of the bankruptcy system." *In re Goodrich Petrol. Corp.*, 894 F.3d 192, 204 (5th Cir. 2018).

Here, the Insurers' Claim is a "Claim." The Plan defines "Claim" as "a claim, as defined in section 101(5) of the Bankruptcy Code, asserted against the Debtors." ROA.7259 (Art. I.A.15). Section 101(5), in turn, broadly defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). Under this definition, "an obligation need not be enforceable to be a 'claim' as defined by the Code," and a

"'Claim' may also include a cause of action or right to payment that has not yet accrued or become cognizable." 2 Collier on Bankruptcy ¶ 101.05(1) (16th ed. 2026); *see also, e.g.*, *In re Trevin*o, 535 B.R. 110, 147-48 (Bankr. S.D. Tex. 2015).

The Insurers' Claim fits within the definition of "Claim" because it is a right to payment. More specifically, when SandRidge filed its bankruptcy, the Insurers had a contingent, unliquidated right to payment from SandRidge that arose prior to the bankruptcy petition from the subrogation rights that existed in the 2012 Policies. On this point, the bankruptcy court agreed with SandRidge, recognizing that "the Insurers had a pre-petition unliquidated and contingent claim for subrogation against SandRidge." ROA.14427.

Because the Insurers' Claim is a "Claim," it was discharged under the Plan, and the Plan permanently enjoins the Insurers from pursuing it. ROA.7259, 7295, 7297-98. The confirmed Plan's disposition of the Insurers' Claim is preclusive to the Insurers because they had multiple notices of the bankruptcy proceedings, including notice of the discharge and injunction, yet did not contest anything. *See supra* p.7; *In re German Pellets La., L.L.C.*, 91 F.4th 802, 809-10 (5th Cir. 2024) ("If an interested party has 'notice or actual knowledge' of the bankruptcy, that party must 'come forward and protect their enhanced rights . . . or else lose their rights through the sweeping discharge of Chapter 11.'" (omission in original; citation omitted)); *see*

*also In re Intelogic Trace, Inc.*, 200 F.3d 382, 391 (5th Cir. 2000); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1049-50 (5th Cir. 1987).

### B. SandRidge did not assume the 2012 Policies, which give rise to the Insurers' Claim.

Attempting to circumvent the discharge and injunction against the pursuit of their Claim, the Insurers argued an exception based on assumption of their 2012 Policies applies. That argument is incorrect. Under the Plan's plain language, SandRidge did not assume the 2012 Policies because they were neither executory nor unexpired at the time of the 2016 bankruptcy.

#### 1. Under the Plan's plain language, SandRidge assumed D&O policies that were executory and unexpired only.

Under the Plan's unambiguous, plain language, SandRidge assumed only certain types of D&O policies: ones that were both executory and unexpired. ROA.7284 (Art. IV.M).

It is undisputed that the 2012 Policies are "D&O Liability Insurance Policies," as defined by the Plan. ROA.7261 (Art. I.A.33); ROA.13298. The Plan contains a section that governs D&O Liability Insurance Policies specifically, entitled "*Director and Officer Liability Insurance.*" ROA.7284 (Art. IV.M). That section does ***not*** provide that SandRidge assumed all D&O Liability Insurance

Policies; rather, that section provides that SandRidge assumed only certain D&O Liability Insurance Policies:

> ***To the extent that*** the D&O Liability Insurance Policies are considered to be ***Executory Contracts***, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, [SandRidge] shall be deemed to have assumed all ***unexpired*** D&O Liability Insurance Policies with respect to [SandRidge's] directors, managers, officers, and employees serving on or before the Petition Date ***pursuant to section 365(a) of the Bankruptcy Code***. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of [SandRidge's] assumption of each of the ***unexpired*** D&O Liability Insurance Policies. . . .

ROA.7284 (Art. IV.M) (emphases added). Under this language, to qualify for assumption, a policy had to satisfy two conditions: (1) it had to be an "Executory Contract[]"; and (2) it had to be "unexpired." ROA.7284. Failure to satisfy either condition is fatal to assumption. *See* ROA.7284. The phrase "[t]o the extent" signals contingency—some policies may not be executory, and assumption can occur only "[t]o the extent" that they are. *See* ROA.7284.

The Plan also provides that assumption occurred "pursuant to section 365(a) of the Bankruptcy Code." ROA.7284. Under section 365(a), a contract must be executory to be able to be assumed. 11 U.S.C. § 365(a). Indeed, it is a black-letter principle of bankruptcy law that a contract must be executory to be able to be assumed. 3 Collier on Bankruptcy ¶¶ 365.01, 365.02(1).

Thus, the requirement for a D&O Liability Insurance Policy to be executory in order to be capable of assumption is not only a requirement of the Plan, but it is also a requirement under bankruptcy law. And the Plan went one step further than the law, limiting assumption to D&O Liability Insurance Policies that were both executory ***and*** unexpired.

The next step is to determine whether the 2012 Policies in particular—as distinct from other D&O Liability Insurance Policies for other policy years or which covered not just the D&Os but also SandRidge—were executory and unexpired and, therefore, assumed. They were not, for the reasons discussed below.

**2. SandRidge did not assume the 2012 Policies because they were not executory.**

One reason that SandRidge could not assume the 2012 Policies is because they were not executory. The Plan defines an "Executory Contract" as "a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code." ROA.7262 (Art. I.A.50). Section 365 "empowers debtors, 'subject to the court's approval,' to 'assume or reject any executory contract.'" *Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 672 & n.1 (5th Cir. 2022) (quoting 11 U.S.C. § 365(a)). "That means that a debtor may choose either to perform (assume) or breach (reject) any contract that neither party has finished performing." *Id.* at 672 (citation and internal quotation marks omitted).

Section 1123 likewise allows the Plan to provide for assumption or rejection of any executory contract. 11 U.S.C. § 1123(b)(2). While those sections use the term "executory contract," neither section nor any other part of the Bankruptcy Code defines that term. So most circuits, including this one, adopted the "Countryman test" for determining whether a contract is executory. *In re Falcon*, 44 F.4th 348, 352-53 & n.4 (5th Cir. 2022) (citing *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 504 (3d Cir. 2021)); 3 Collier on Bankruptcy ¶ 365.02(2)(a) & n.11.

"[T]he Countryman test has two prongs." *Falcon*, 44 F.4th at 354. "First, a contract is executory only if performance remains due to some extent on both sides." *Id.* at 352, 354 (internal quotation marks omitted). Second, a contract is executory only "if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Id.* at 352, 355 (internal quotation marks omitted). "In other words, the test for an executory contract is whether, under the relevant state law governing the contract, each side has at least one material unperformed

obligation as of the bankruptcy petition date." *Id.* at 352 (internal quotation marks omitted).[6]

The 2012 Policies do not satisfy either prong of the Countryman test.

***First***, SandRidge had no remaining performance obligations under the 2012 Policies when it filed bankruptcy in 2016. SandRidge paid the insurance premiums fully, and the Insurers earned those premiums by the expiration of the policy period in February 2013—years before SandRidge filed its 2016 bankruptcy. ROA.13298, 13308 § 7(b); *see also* ROA.10627, 10645-46. SandRidge did not have any remaining performance obligations in 2016, particularly when these policies were Side A policies in which the "Insureds" were the D&Os (not SandRidge) and coverage benefitted and was payable on behalf of only the D&Os for claims made against the D&Os. ROA.13302, 13304, 13319.[7] For example, the policies contain a duty to provide assistance, cooperation, and consent, but this only applied to the D&Os as

[6] "Professor Countryman observed that if the debtor fully performed a contract before the commencement of the case, and only the other party's obligations remained unperformed, the contract should not be viewed as executory because the debtor's right to receive the other party's obligation would simply be an asset of the estate." 3 Collier on Bankruptcy ¶ 365.02(2)(a).

[7] *See also* Gary Lockwood, Law of Corporate Officers & Directors: Indemnification & Insurance § 4:1 (2nd ed. 2025) (explaining Side A coverage). Such policy proceeds are not even property of the debtor's estate. *In re Mountain Express Oil Co.*, 674 B.R. 747, 759, 766-67 (Bankr. S.D. Tex. 2025).

Insureds, not SandRidge. ROA.13307, 13322. "[A] contract where the debtor fully performed all material obligations," as here, "cannot be executory." *Falcon*, 44 F.4th at 353; *see also In re Baird*, 567 F.3d 1207, 1211-13 (10th Cir. 2009).

***Second***, even if SandRidge had remaining performance obligations under the 2012 Policies in 2016 (it did not), a failure to complete any such performance obligations would not have constituted a material breach of the 2012 Policies that excused the Insurers from performance. When SandRidge paid the premiums, the policies took effect, and the Insurers were obligated to provide coverage to the D&Os as Insureds for claims reported during the year-long 2012-2013 policy period regardless of what SandRidge did or didn't do. *See* ROA.13298-303, 13311, 13324.

The 2012 Policies are analogous to the surety bonds and indemnity agreement (together, the "Surety Bond Program") that this Court in *Falcon* reviewed and determined were not executory because they did "not satisfy the Countryman test's second requirement." *Falcon*, 44 F.4th at 355.

In *Falcon*, the Surety Bond Program "create[ed] a three-party relationship" between a debtor (Falcon), an insurer, and third-party obligees. *Id.* at 350 & n.1. Falcon paid premiums to the insurer for the Surety Bond Program, under which the insurer was obligated to pay the third-party obligees upon certain conditions. *Id.* at

351. The Surety Bond Program also required Falcon to indemnify the insurer for amounts paid to the third-party obligees. *Id.*

Falcon later filed bankruptcy, and its plan stated that it "shall be deemed to have assumed each executory contract . . . to which it is a party." *Id.* at 351-52 (omission in original). After plan confirmation, the insurer demanded payment from Falcon based on indemnity, claiming Falcon assumed the Surety Bond Program according to the plan. *Id.* Falcon refused, claiming it did not assume the Surety Bond Program because it is not executory and, instead, the plan discharged the insurers' claims. *Id.* at 351, 355.

This Court agreed with Falcon. *Id.* at 355. The Court explained that "even if Falcon V failed to perform its obligations under the Surety Bond Program, [the insurer] would not be excused from its performance obligations to the obligees." *Id.* "And because Falcon V's failure to perform would not excuse [the insurer] from performing, the Surety Bond Program fails the Countryman test . . . ." *Id.* Accordingly, the Court held that "the Surety Bond Program is not an executory contract" and thus "was not assumed under the Plan." *Id.*

Like the three-party relationship in *Falcon* where the debtor paid the insurer whose obligations ran to third parties, a similar structure exists for the Side A, D&O policies here: debtor SandRidge paid the Insurers whose coverage obligations ran to

third-party D&Os. ROA.13298, 13302-04. And just as failure to perform by the debtor in *Falcon* to the insurer after bankruptcy did not allow the insurer to escape its obligations to the third parties, any failure to perform by SandRidge to the Insurers in 2016 or thereafter would not have allowed the Insurers to escape their obligations to the D&Os. The Insurers' performance obligations were irrevocable on two grounds: structurally, because the premiums were fully paid and the policies had ended years earlier; and contractually, because the policies contained a "**NON-RESCISSION**" clause that stated, "This POLICY shall not be rescinded or voided by the INSURER in whole or in part for any reason." ROA.13298, 13311, 13324. Because the Insurers could not refuse their coverage obligations once the premium was paid, any post-payment breach by SandRidge would not constitute a material breach that could excuse the Insurers' performance. The second Countryman element is thus not satisfied—just as in *Falcon*.

Another instructive case is *Baird*, in which the Tenth Circuit held that a claims-made insurance policy was not executory under the Countryman test because, at the time of the bankruptcy, the debtor had already paid the premium and the end of the policy period had passed. 567 F.3d at 1211-13. There, a doctor paid premiums to an insurer for a claims-made professional liability policy with a policy period of 2003 to 2004. *Id.* at 1208-09, 1212. In 2006, the doctor filed bankruptcy.

*Id.* at 1209. The Tenth Circuit explained that "if a policy *period* has expired, then even though the debtor may have additional obligations, the contract for that period is not executory." *Id.* at 1212. That is because "[t]here is nothing left, after [the debtor] has paid his premium for the policy period, that would result in his so far underperforming that it would relieve [the insurer] from its obligations." *Id.* at 1212-13; *see also* 9 New Appleman on Insurance Law Library Edition § 108.02(2)(c)-(d) (2026) ("Insurance policies for which the premiums have been paid, or that have expired according to their terms, are not executory contracts.").

Just as in *Baird*, at the time of SandRidge's bankruptcy in 2016, SandRidge had already paid the premium for the claims-made 2012 Policies, and the end of the policy period had passed. *Supra* p.25. There was thus nothing left that would excuse the Insurers' performance, rendering the 2012 Policies non-executory.

In the district court, the Insurers argued for the first time that the 2012 Policies were executory because SandRidge had an obligation to notify the Insurers of any claims under the 2012 Policies. ROA.15216 (citing ROA.13309). That argument misapprehends the 2012 Policies and the law. As discussed above, the 2012 Policies are labeled "**CLAIMS MADE POLICY**." ROA.13298. "Claims-made policies provide coverage only where the underlying claim is first made, in writing, during the policy period." *Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's London*,

656 A.2d 1094, 1095 (Del. 1995); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Willis*, 296 F.3d 336, 339 (5th Cir. 2002); 4 New Appleman on Insurance Law Library Edition § 26.02. That requirement is precisely set forth in the 2012 Policies. ROA.13302 § 1(a); ROA.13303 § 2(b). "The purpose of claims-made policies . . . is to provide exact notice periods that limit liability to a fixed period of time 'after which an insurer knows it is no longer liable under the policy . . . .'" *Nat'l Union*, 296 F.3d at 343 (citation omitted); *Med. Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879, at *13 (Del. Super. Ct. Sept. 29, 2016). Occurrence policies, in contrast, are "fundamentally different" because they provide coverage for an event that occurs during the policy period, regardless of when a claim is made. *Hoechst Celanese*, 656 A.2d at 1095 n.1; *Chandler v. Valentine*, 330 P.3d 1209, 1212 (Okla. 2014); *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 762 n.1 (Tex. 2013) (Boyd, J., concurring).

Because the 2012 Policies are claims-made policies, the Insurers were obligated to provide coverage to D&Os for claims made in writing during the 2012-2013 policy period, which ended at "12:01 a.m. [on] 02/28/2013." ROA.13298, 13302-03, 13318-19. The first Securities Lawsuit was filed in 2012. ROA.10641. Before the 2016 bankruptcy, the Insurers had notice of the Securities Lawsuits, accepted coverage of the D&Os in those lawsuits, and paid the D&Os' defense costs.

*Supra* p.4. By the time SandRidge filed its 2016 bankruptcy, it did not have an unperformed, remaining obligation to provide notice of any claims under the 2012 Policies, and in any event, any such notice requirement would not have affected the Insurers' provision of coverage to the D&Os. Indeed, by 2016, there were no outstanding claims for which notice had not been given, and none have been suggested. Therefore, in 2016 or thereafter, a failure to give notice by SandRidge could not have arisen that would have constituted a material breach of the 2012 Policies that excused the Insurers' performance.

Because the 2012 Policies fail the Countryman test, they were not executory and therefore could not be assumed.

#### 3. SandRidge also did not assume the 2012 Policies because they expired years before the bankruptcy.

A second, independent reason that SandRidge did not assume the 2012 Policies is because they were not "unexpired." ROA.7284. The 2012 Policies expired when the policy period ended on February 28, 2013—more than three years before the 2016 bankruptcy. ROA.98, 7180, 13298.

The nature of claims-made policies supports this conclusion. As discussed above, claims-made policies provide coverage for claims during the policy period only. This structure provides insurers "certainty that when the policy period ends without a claim being made, the insurer will be exposed to no more liability." *Med.*

*Depot*, 2016 WL 5539879, at *13; *see also Am. Home Assurance Co. v. Abrams*, 69 F. Supp. 2d 339, 346-47 (D. Conn. 1999) (same); *Resol. Tr. Corp. v. Ayo*, 31 F.3d 285, 289 (5th Cir. 1994) ("The notice requirements in claims made policies allow the insurer to 'close its books' on a policy at its expiration and therefore 'attain a level of predictability unattainable under standard occurrence policies.'" (citation omitted)). The 2012 Policies are claims-made policies with a coverage period that ended in February 2013—three years before bankruptcy. ROA.98, 7180, 13298. Because claims-made policies like these are designed to have definite endpoints, treating them as "unexpired" years after that endpoint would contradict the policy's plain terms outright.

This conclusion is also supported by the plain, ordinary meaning of the word "unexpired" in dictionaries, as well as the insurance industry's understanding of the meaning of an unexpired policy, which both align. Because the word "unexpired" is not defined in the Plan or the Bankruptcy Code, the Court can consider the word's "plain, ordinary meaning" based on dictionary definitions and the "gloss in the relevant industry" if any. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738-40 (Del. 2006) (citation modified); *Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 2771509, at *17 & n.203 (Del. Ch. Apr. 4, 2023). The plain, ordinary dictionary meaning of "unexpired" is not yet come to end, run out, or

finished.[8] Similarly, the insurance industry considers an insurance policy to be expired on the date that insurance coverage ends.[9] So then, again, the 2012 Policies were expired before the 2016 bankruptcy because the coverage period ended in 2013; conversely, they were not unexpired in 2016 because they had already ended in 2013.

Because the 2012 Policies expired well before 2016, SandRidge did not assume them under the Plan's plain language.

#### 4. The Confirmation Order and Plan did not determine whether any particular D&O policy, such as the 2012 Policies, were assumed.

Neither the bankruptcy court nor the district court analyzed whether the 2012 Policies were executory or unexpired. (Had they done so, the answer clearly would have been they were not executory and had expired.) Although each court below ignored these requirements, they did so for different reasons. The bankruptcy court

---

[8] *E.g.*, *Unexpired*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/unexpired; *Unexpired*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/unexpired; *Unexpired*, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/unexpired (all last visited May 26, 2026).

[9] *E.g.*, *What Does Expiration Date Mean?*, Insuranceopedia, https://www.insuranceopedia.com/definition/1826/expiration-date; *Insurance Expiration Date Definition*, Hiscox, https://www.hiscox.com/glossary/insurance-expiration-date-definition; *Expiration Date – When Coverage Officially Ends*, Total CSR, https://totalcsr.com/insurance-glossary/expiration-date/; *Insurance Terms & Definitions – Expiry Date*, Founder Shield, https://foundershield.com/insurance-terms/definition/expiry-date/ (all last visited May 26, 2026).

concluded it was precluded from considering whether the 2012 Policies were assumed based on res judicata because, in its view, the Confirmation Order entered by Bankruptcy Judge Jones "cemented the assumption." ROA.14425-26. District Judge Hoyt did not affirm the bankruptcy court's reasoning and held that the bankruptcy court's opinion about "the nature of the contract obligations and the status of the provisions under the Plan" is "not relevant here." ROA.15546.

The lower courts erred. "Res judicata does not apply where a claim is expressly reserved by the litigant in the earlier bankruptcy proceeding." *In re Tex. Wyoming Drilling, Inc.*, 647 F.3d 547, 553 (5th Cir. 2011). Thus, when a confirmation order "leaves open the opportunity" to bring a subsequent action on parts of a claim, the claim is not precluded. *Id.* For example, in *Falcon*, the confirmed plan stated that the debtor "shall be deemed to have assumed each executory contract . . . to which it is a party" and, "[a]ccordingly, the bankruptcy court ordered that 'all executory contracts . . . of [the debtor] shall be deemed assumed to the extent assumable under Bankruptcy Code section 365.'" 44 F.4th at 351-52 (omissions in original). Nevertheless, after confirmation, this Court determined whether the surety bonds and indemnity agreement were executory and thus assumed based on their substance and the merits of executory contract principles (with no preclusion or other procedural impediments coming into play). *Id.* at 351-56; *see also In re Greater Se.*

*Comm. Hosp. Corp. I*, 327 B.R. 26, 34 (Bankr. D.C. 2005) ("The Bankruptcy Code permits questions of assumption or rejection under the plan to be determined after confirmation of a plan calling for such post-confirmation determination.").

Here, the Confirmation Order and the Plan reserved—rather than resolved—whether any particular D&O Liability Insurance Policy, such as the 2012 Policies, were executory and unexpired and thus assumed. The Confirmation Order confirmed the Plan "in its entirety" and "incorporated [it] by reference" as "an integral part of th[e] Confirmation Order." ROA.7207. As explained above, the section of the Plan governing D&O Liability Insurance Policies (Article IV.M) did not provide that SandRidge would automatically assume all D&O policies; rather, it imposed two requisite conditions—executory and unexpired—both of which had to be satisfied in order for any particular D&O Liability Insurance Policies to be assumed. *Supra* pp.21-23 (discussing ROA.7284). The Plan's language does not state that any specific D&O Liability Insurance Policy, such as a 2012 Policy, was necessarily considered executory or was unexpired. Likewise, the Confirmation Order approved the Plan—including both those requirements—without ever determining whether the 2012 Policies satisfied those requirements. *See* ROA.7207-08.

A freestanding reservation elsewhere in the Plan reinforces that assumption was not automatic. ROA.7288 (Art. V.I). That reservation provides that nothing in the Plan "shall constitute an admission by [SandRidge] that any such contract . . . is in fact an Executory Contract . . . or that any Reorganized Debtor has any liability thereunder." ROA.7288. This reservation aligns with the principle that a bankruptcy plan cannot transform a non-executory contract into an executory one simply by labeling it "assumed." *See In re Exide Techs.*, 378 B.R. 762, 766-67 (Bankr. D. Del. 2007).

The Plan also retains post-confirmation jurisdiction, "[n]otwithstanding the entry of the Confirmation Order," to "resolve any matters related to . . . ***any dispute regarding whether a contract or lease is or was executory or expired***." ROA.7301-02 (Art. XI.3) (emphasis added). This retention shows that the Plan deliberately deferred the key threshold determination of whether a contract such as the 2012 Policies were executory or expired—precisely the kind of express reservation that avoids preclusion under *Texas Wyoming*. While that jurisdiction may be concurrent with another state court, it plainly left the door completely open to having this threshold issue addressed later, if necessary.

The only language from either the Plan or Confirmation Order that the bankruptcy court used to support its preclusion holding is the second sentence of

Article IV.M of the Plan, which states: "Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of [SandRidge's] assumption of each of the ***unexpired*** D&O Liability Insurance Policies." ROA.14426 (emphasis added) (quoting ROA.7284). The bankruptcy court overlooked that this sentence expressly limits assumption to "unexpired" policies. ROA.7284. The bankruptcy court also failed to give any meaning to the beginning of the first sentence of Article IV.M, which states: "***To the extent that*** the D&O Liability Insurance Policies are considered to be ***Executory Contracts***, . . . ." ROA.7284 (emphases added). That prefatory clause further limited the assumption set forth in the remainder of Article IV.M to policies considered to be Executory Contracts. Also, the bankruptcy court ignored the part of the first sentence of Article IV.M that states SandRidge "shall be deemed to have assumed all ***unexpired*** D&O Liability Insurance Policies . . . ***pursuant to section 365(a) of the Bankruptcy Code.***" ROA.7284 (emphases added). As explained above, under section 365(a), a contract must be executory to be able to be assumed. *Supra* p.22. The bankruptcy court erred by not reading the entire Article IV.M as a whole and giving meaning to all the language used. *See, e.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

The bankruptcy court cited *Espinosa* to support its preclusion holding, but that case is inapposite and does not even involve res judicata or preclusion. ROA.14425-

26 (citing *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269, 275-76 (2010)). In *Espinosa*, the Supreme Court declined to void a final judgment based on a creditor's post-confirmation complaints about lack of adequate notice of a debtor's plan to discharge part of his student loan debt. 559 U.S. at 272 (analyzing Fed. R. Civ. P. 60(b)(4)). Unlike in *Espinosa*, where the creditor tried to void a discharge of a debtor's debt as resolved by a confirmation order, here, SandRidge is a former debtor seeking to enforce what a confirmation order expressly left open.

Although not relied on by the bankruptcy court, the Insurers tried to further argue the effect of what they characterized as a "general provision" of the Plan entitled "*Insurance Policies*" (Article V.F), which provides:

> ***Without limiting Article IV.M***, all of [SandRidge's] insurance policies . . . are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, [SandRidge] shall be deemed to have assumed all insurance policies . . . .

ROA.7287 (emphasis added); ROA.15210. Article V.F does not apply to the 2012 Policies because they are governed by the prior and more specific Article IV.M about D&O Liability Insurance Policies, discussed above. ROA.7284. A specific contract provision controls over a general provision when they pertain to the same subject matter and conflict. *In re Pirani*, 824 F.3d 483, 494 (5th Cir. 2016); *Barnard Const. Co., v. City of Lubbock*, 457 F.3d 425, 429 (5th Cir. 2006); *In re Safety-Kleen Corp.*, 380 B.R. 716, 737-38 (Bankr. D. Del. 2008); *In re HQ Glob. Holdings, Inc.*, 290 B.R.

78, 82 (Bankr. D. Del. 2003); *In re PRS Ins. Grp.*, 2003 WL 21262446, at *2 (Bankr. D. Del. May 30, 2003). To hold otherwise would impermissibly render the "executory" and "unexpired" assumption requirements from Article IV.M meaningless, yet Article V.F plainly states that it does not limit Article IV.M. ROA.7284, 7287; *see Pirani*, 824 F.3d at 494.

In summary, the Confirmation Order and Plan reserved—rather than resolved—the question of whether the 2012 Policies were executory, unexpired contracts that were assumed. Because the Confirmation Order and Plan left this threshold issue open, the bankruptcy court erred in treating it as precluded. When the assumption requisites are actually considered as applied to the 2012 Policies, it is clear that the 2012 Policies were not executory and were expired and, therefore, were not assumed. Because they were not assumed, they do not provide a basis for the Insurers' Claim to escape discharge and injunction, as the Insurers contended.

### C. Assumption of the indemnification obligations is irrelevant here.

The Insurers have previously argued in the alternative that even if SandRidge did not assume the 2012 Policies, the Insurers' Claim may nonetheless proceed forward because SandRidge assumed indemnification obligations owed to Bennett and Grubb. But assumption of the indemnification obligations is irrelevant here, and it has no impact on the Plan's discharge and injunction of the Insurers' Claim.

The Insurers' argument is rooted in conflation of two legally distinct things: (1) the Insurers' Claim for reimbursement, which arises under the subrogation provision in the 2012 Policies, and (2) Bennett and Grubb's claims for indemnification, which arise under the indemnification obligations in their employment contracts and SandRidge's organizational documents. Those are different claims, held by different persons/entities, arising from different contracts:

- ***Different persons/entities.*** The Oklahoma State Case involves four separate counter-plaintiffs who have asserted counterclaims against SandRidge: Beazley (an Insurer), Old Republic (another Insurer), Bennett (in his individual capacity), and Grubb (in his individual capacity). ROA.10621, 10631, 10633. In its motion to enforce the Plan, SandRidge sought to enforce the Plan against the ***Insurers***. ROA.10433, 10441-44. SandRidge did not seek and still is not seeking to enforce the Plan against ***Bennett and Grubb***. That is why the Insurers are parties to this appeal and not Bennett or Grubb.
- ***Different claims.*** In the Oklahoma State Case, the Insurers seek subrogation. ROA.10647. Bennett and Grubb seek indemnity. ROA.10631, 10647. For example, here is a portion of the Insurers', Bennett's, and Grubb's counterclaim pleading, which treats the two sets of parties and their claims distinctly:

77. Counterclaim Plaintiffs Bennett and Grubb are entitled to indemnification from SandRidge for defense and settlement costs incurred in connection with the Glitz Class Action and the Lanier Class Action under the Bylaws, the Indemnification Agreements, the POR, and Delaware law.

78. Having funded the settlement of the Lawsuits, Counterclaim Plaintiffs Beazley, Old Republic and Allied World are subrogated to the interests of Counterclaim Plaintiffs Bennett and Grubb and are entitled to recover from SandRidge the amounts paid or to be paid on behalf of Counterclaim Plaintiffs Bennett and Grubb to defend and settle the Lawsuits.

ROA.10647. As another example of the recognized separateness of the claims, in briefing to the bankruptcy court, the Insurers referenced "the Counterclaim asserted by either Bennett and Grubb (in their individual capacities based on the assumed Indemnification Obligations), or the Insurers (via their subrogation rights under the separately assumed D&O Liability Insurance Policies), in the Oklahoma Action." ROA.14379. In its motion to enforce the Plan, SandRidge sought a ruling that the ***Insurers' Claim*** for reimbursement is barred by the Plan. ROA.10433, 10441-44. SandRidge did not seek and still is not seeking a ruling that ***Bennett and Grubb's indemnification claims*** are barred by the Plan.

- ***Different contracts.*** As the Insurers have repeatedly said, the Insurers' Claim arises under the 2012 Policies, which contain a subrogation provision. *E.g.*, ROA.10455, 10461-62, 10483, 10646, 13311, 14397. In contrast, Bennett and

Grubb's indemnification claims arise from indemnification obligations in their employment contracts and SandRidge's organizational documents, which have nothing to do with the Insurers. ROA.10631, 10634-41, 10603-20. These are different contracts, negotiated at different times, between different parties, for different reasons, on different terms.

In summary, the issue in this appeal is whether the ***Insurers' Claim for reimbursement*** was discharged and enjoined, given that SandRidge did not assume the 2012 Policies. The issue is not whether ***Bennett and Grubb's claims for indemnification*** were discharged and enjoined, given that SandRidge assumed indemnification obligations to Bennett and Grubb. To be clear, SandRidge acknowledges that it assumed indemnification obligations to Bennett and Grubb to the extent consistent with applicable law and, therefore, Bennett and Grubb's indemnification claims based on those indemnification obligations personal to them are not barred by the Plan. ROA.7287. Bennett and Grubb's indemnification claims may proceed forward in the Oklahoma State Case, unimpacted by this appeal. The distinction between Bennett and Grubb's indemnification claims against SandRidge versus the Insurers' Claim for reimbursement against SandRidge—and the Plan's different treatment of those claims—is illustrated here:




Assumption of indemnification obligations to Bennett and Grubb does not somehow empower the Insurers' Claim to circumvent the Plan's discharge and injunction. The Insurers contend that because their claim is based on subrogation, they can now spring into the shoes of Bennett and Grubb and assert their indemnification rights—regardless of the Plan's treatment of the Insurers' own claim. That contention is baseless. Because the Plan bars the Insurers' Claim, the Insurers' Claim remains barred. Period. It is axiomatic that bankruptcy discharges some claims and not others.

The Plan's discharge of the Insurers' Claim would be completely circumvented if the Insurers' Claim is nonetheless allowed to proceed based on the Insurers stepping into a different claim (the indemnification claims) held by third parties (Bennett and Grubb) based on agreements that have nothing to do with the Insurers (Bennett and Grubb's employment contracts and SandRidge's

organizational documents). In effect, the Insurers are attempting to use a derivative argument as a means of piggybacking onto D&O indemnification obligations SandRidge may owe to others—with no regard for the discharge and injunction of their own claim. This circumvention of the discharge and injunction, if permitted, could open the door to a myriad of other creditors purporting to have derivative rights to do likewise and should be rejected.

Despite this, the bankruptcy court accepted the Insurers' conflation of their own claim with Bennett and Grubb's indemnification claims, without providing any reasoning on how this is permissible. In a brief section at the end of the bankruptcy court's opinion, the bankruptcy court addressed "what happens to" Bennett and Grubb's indemnification claims and the Insurers' Claim "if the Indemnification Obligations were assumed." ROA.14432. The bankruptcy court then pointed to undisputed legal propositions from this Court's opinion in *National Gypsum* that "[i]f a debtor assumes a contract, the contract 'will remain in effect through and then after the completion of the reorganization'" and that "[u]pon assumption, the contract becomes a post-petition obligation of the contract parties." ROA.14432-33 (citing *In re Nat'l Gypsum*, 208 F.3d 498, 505 (5th Cir. 2000)). The bankruptcy court concluded: "When SandRidge assumed the Indemnification Obligations through its

plan, they became SandRidge's post-confirmation obligations. SandRidge's motion to enforce the plan is denied." ROA.14433.

Respectfully, the bankruptcy court's analysis missed the mark. The bankruptcy court ignored the distinctions regarding the two sets of claims. As explained above, SandRidge does not dispute that because it assumed the indemnification obligations to the extent consistent with applicable law, they remain in effect after confirmation. That is what the Plan provided. ROA.7287. And SandRidge is not contending that the Plan bars Bennett and Grubb's ability to assert claims based on the indemnification obligations to the extent consistent with applicable law. However, the bankruptcy court never grappled with the actual issue at hand: whether assumption of the indemnification obligations is an exception to the Plan's bar of the ***Insurers' Claim***. On that question, the bankruptcy court's opinion is silent, and *National Gypsum* is irrelevant. The answer to that question is a resounding "no"—assumption of the indemnification obligations is not an exception to the Plan's bar of the Insurers' Claim.

The principle that certain creditors cannot circumvent discharge to receive better treatment than other similarly situated creditors is sacrosanct in bankruptcy and to this Court. This Court's decision in *Serta* supports that the Insurers cannot use the concept of stepping into third parties' shoes to effectuate an end-run around

the discharge provision. *Serta*, 125 F.4th at 588-91. The Court in *Serta* characterized relabeling an indemnity claim in a bankruptcy plan as an "impermissible end-run around the Code" when the claim would otherwise be thrown out because it was inconsistent with the Code. *Id.* The Court looked at how the new claim functioned, not just what it was labeled, and noted that "end-runs by canny creditors around the disallowance provisions of the Code" are "reject[ed]." *Id.* at 590-91 (internal quotation marks omitted). That logic applies here: the Insurers' attempt to collect on a discharged subrogation claim by leapfrogging onto assumed indemnification obligations to third parties is precisely the type of end-run that *Serta* prohibits. The Insurers cannot do indirectly what the Plan and Code forbade them from doing directly. Using a derivative sleight of hand via indemnification obligations owed to D&Os should be prohibited.

The rulings below to the contrary threaten the fresh start at the heart of bankruptcy law. If the rulings are allowed to stand, it would open a back door to evading discharge for other insurers with future subrogation rights and even other types of creditors who might try to invoke other derivative rights. The Insurers here received notice of SandRidge's bankruptcy and remained silent. *See supra* p.7. They lodged no complaint or dispute during the bankruptcy about their treatment under the Plan. Now, years after SandRidge received and relied on the Plan's discharge and

injunction, the Insurers seek to evade the Plan's carefully crafted terms. If the Insurers here can sidestep discharge by leapfrogging onto assumed indemnification obligations between a debtor and third parties, then every issuer of D&O policies containing subrogation rights or even other parties holding derivative rights remotely associated with assumed contracts between debtors and third parties will be able to impose limitless exposure on reorganized debtors—and the certainty that a bankruptcy discharge is supposed to provide will become illusory.

The Court should hold that the Plan bars the Insurers' Claim as a matter of law by discharging it and enjoining it from proceeding.

### D. Because the Plan bars the Insurers' Claim, the bankruptcy court should have reopened the bankruptcy case to enforce the Plan.

Because the Plan bars the Insurers' Claim as a matter of law, the bankruptcy court abused its discretion by not reopening the bankruptcy case to enforce the Plan.

A bankruptcy case "may be reopened in the court in which such case was closed . . . to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). "The phrase 'or for other cause' as used in § 350(b) is a broad term which gives the bankruptcy court discretion to reopen a closed estate or proceeding when cause for such reopening has been shown." *In re Dorsey*, 870 F.3d 359, 364 (5th Cir. 2017). "This discretion depends upon the circumstances of the individual case and accords with the equitable nature of all bankruptcy court proceedings." *Case*, 937 F.2d at

1018. "[C]ourts should readily reopen a closed bankruptcy case to ensure that the essential purposes of the discharge are not undermined." 4 Collier on Bankruptcy ¶ 524.02(2)(c); *see also* 3 Collier on Bankruptcy ¶ 350.03(4).

The bankruptcy court agreed with SandRidge that "if the Insurers are violating the plan through their assertion of the Insurer Subrogation Claim, good cause exists to reopen SandRidge's case for the purpose of enforcing the plan." ROA.14424. Nonetheless, the bankruptcy court declined to reopen the bankruptcy case because the court concluded that the Insurers' Claim "does not violate the plan." ROA.14424.

The bankruptcy court's conclusion that Insurers' Claim does not violate the Plan is erroneous for the reasons discussed above: The Insurers' Claim violates the Plan because the plain language of the Plan bars the Insurers' Claim. *Supra* Argument I.A-C. Because the Insurers are violating the Plan, cause exists for reopening the bankruptcy case to enforce the Plan against the Insurers by prohibiting them from pursuing their claim. The bankruptcy court erred in refusing to do so.

## II. The Plan also bars the Insurers' Claim because it is a "Section 510(b) Claim" that the Plan independently canceled and released.

Besides the discharge and injunction, an independent barrier to the Insurers' Claim remains: the Plan canceled and released "Section 510(b) Claims," and the Insurers' Claim is a "Section 510(b) Claim." Instead of addressing the Insurers'

Claim, the Insurers' defense below was to again point to SandRidge's assumption of indemnification obligations owed to Bennett and Grubb—but again, assumption of the indemnification obligations is irrelevant here.

### A. The Plan canceled and released "Section 510(b) Claims," and the Insurers' Claim is a "Section 510(b) Claim."

Under the plain language of the Plan, the Insurers' Claim is a Section 510(b) Claim that was canceled and released. The Plan clearly and unambiguously provides that Section 510(b) Claims are canceled and released in Class 7 of the Plan, stating:

> ***Each Section 510(b) Claim shall be deemed canceled and released*** and there shall be no distribution to Holders of Section 510(b) Claims on account of such Claims.

ROA.7277 (Art. III.B.8) (emphasis added). The next question, then, is: What is the definition of a Section 510(b) Claim? The Plan specifically defines "Section 510(b) Claims" as follows:

> ***[A]ny Claims against [SandRidge] arising from*** (a) rescission of a purchase or sale of a security of [SandRidge] or an Affiliate of [SandRidge], (b) ***purchase or sale of such a security***, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, including the Claims asserted against [SandRidge] in [the Securities Litigation].

ROA.7268 (Art. I.A.127) (emphases added).

The Plan's definition is based on Section 510(b) of the Bankruptcy Code, which is part of Congress' deliberate pecking order for payment rights in bankruptcy

and equitable distribution among creditors. Hon. Joan N. Feeny & Michael J. Stepan, 1 Bankruptcy Law Manual § 6:72 (5th ed. 2025). Section 510(b) of the Bankruptcy Code subordinates certain creditors' claims behind other creditors' claims—that is, the Code mandates subordination of "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such claim" behind "all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b); *see also* 1 Bankruptcy Law Manual § 6:74. The Plan here went even further than the Bankruptcy Code's mandatory subordination by canceling and releasing Section 510(b) Claims altogether. ROA.7277. If bankruptcy payments were a game of Chutes and Ladders, Section 510(b) would be the chute that takes the player back to the very start. And under this Plan, Section 510(b) would sweep a player off the board, altogether.

Courts interpret the "arising from" language broadly. "For a claim to 'arise from' the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale." *In re SeaQuest Diving, LP*, 579 F.3d 411, 421 (5th Cir. 2009); *accord, e.g.*, *In re Charge Enters., Inc.*, 2024 WL 5131141, at *9-10 (Bankr. D. Del. Dec. 16, 2024) ("Section 510(b) . . . only requires some nexus

or causal relationship between the claim and the purchase or sale of securities."). "[C]ourts agree that a claimant need not be an actual shareholder for his claim to be covered by § 510(b)." *SeaQuest*, 579 F.3d at 422 (citation modified). The nexus or causal relationship test captures derivative claims, including indemnity claims of directors and officers. *Charge Enters.*, 2024 WL 5131141, at *10; *see also In re Touch Am. Holdings, Inc.*, 381 B.R. 95, 104-05 (Bankr. D. Del. 2008) (subordinating D&O indemnification claims arising out of ERISA fiduciary breaches); *In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816, 829 (Bankr. D. Del. 1999) ("§ 510(b) is unambiguous in requiring the subordination of Claimants' reimbursement claims," arising under a certificate of incorporation, "both for liability and expenses, resulting from securities law claims by purchasers or sellers of a debtor's securities.").

*Charge Enterprises* is particularly instructive. There, directors and officers sought indemnification for their expenses in defending against securities lawsuits filed against them for violations of sections 10(b) and 20(a) of the Securities Exchange Act. *Charge Enters.*, 2024 WL 5131141, at *1-3. The Delaware bankruptcy court held that the directors' and officers' indemnification claims were canceled and released under the bankruptcy plan because they were Section 510(b) claims. *Id.* at *5, *12. The court found the requisite "nexus" and "causal relationship" existed because "a purchase or sale of securities caused the litigation, which caused the

indemnification claims." *Id.* at *10. In other words, because the securities lawsuits alleged "violation of section 10(b), a law imposing restrictions on the purchase and sale of securities, the litigation arose from the purchase or sale of securities" and, in turn, "because the indemnification claims arose out of that litigation, the indemnification claims ultimately arose out of that same alleged misconduct and thus from the purchase or sale of securities." *Id.*

Likewise, the Insurers' Claim falls squarely under the Plan's definition of Section 510(b) Claims. As previously discussed, the Insurers' Claim constitutes a "Claim," which is defined as a "right to payment." ROA.7259; 11 U.S.C. § 101(5); *supra* pp.19-20. And the Insurers' Claim against SandRidge, at a minimum, "arises from" the "purchase and sale of such a security" of SandRidge or a SandRidge affiliate—exactly as set forth in the Plan (ROA.7268)—because the Insurers' Claim seeks reimbursement for payments made to settle the Securities Litigation, where purchasers of securities of SandRidge sued for violations of sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. ROA.1390, 1403-04, 1407-08, 10631-32, 10641-42, 10645-47, 10652, 13267. The causal chain is straightforward: the Insurers' Claim arose from payments made to settle the Securities Litigation, and in turn, the Securities Litigation arose from the purchase and sale of securities. Without the purchase and sale of securities, there would be no

Insurers' Claim. Therefore, the nexus or causal relationship is satisfied, and the Insurers' Claim is a Section 510(b) Claim. *See SeaQuest*, 579 F.3d at 421; *Charge Enters.*, 2024 WL 5131141, at *12. Because it is a Section 510(b) Claim, it was canceled and released. ROA.7277.[10]

**B. Assumption of the indemnification obligations is irrelevant here.**

The bankruptcy court correctly held the Insurers' Claim falls under the Plan's definition of a Section 510(b) Claim. ROA.14427. But the bankruptcy court nonetheless adopted the Insurers' argument that their Claim was not canceled and released as a Section 510(b) Claim because SandRidge assumed indemnification obligations to Bennett and Grubb. ROA.14428-30. Such an end-run around the plain language of the Plan's cancelation and release provision—and Congress' decision about the order in which creditors are to be paid—is erroneous and should not be tolerated.

Just as the Insurers are trying to evade the Plan's discharge and injunction provisions based on assumption of the indemnification obligations, the Insurers are

---

[10] Even if the Insurers' Claim was not a Section 510(b) Claim that was canceled and released under Class 7, it would have at most been a general unsecured claim that received virtually no recovery under Class 5(a). ROA.7276 (Art. III.B.5); ROA.7263 (Art. I.A.59). Either way, the Plan governed the treatment of the Insurers' Claim; it does not ride through bankruptcy.

also trying to evade the Plan's cancelation and release of Section 510(b) Claims in Class 7 based on assumption of the indemnification obligations. Yet again, the Insurers' argument rests on the notion that because Bennett and Grubb's indemnification rights survive, the Insurers can step into their shoes and make the Insurers' Claim survive too. All the reasons discussed above for why such an end-run around the Plan's bar of the Insurers' Claim does not work also apply here—in other words, assumption of the indemnification obligations does not impact cancelation and release of the Insurers' Claim for all the same reasons that assumption of the indemnification obligations does not impact discharge and injunction of the Insurers' Claim. *Supra* Argument Part I.C.

As discussed above, assumption of the indemnification obligations is irrelevant because SandRidge is not moving to enforce the Plan to prohibit Bennett and Grubb from asserting their indemnification claims. *Id.* Rather, the issue in this appeal is whether to enforce the Plan to prohibit the Insurers from asserting their reimbursement Claim. *Id.* And the Insurers' Claim is included in the definition of Section 510(b) Claims, which were canceled and released under the plain language

of the Plan. *Supra* Argument Part II.A.[11] Here is an illustration of this distinction that is specific to cancelation and release:




The bankruptcy court held that the Plan provisions governing assumption of the indemnification obligations have "primacy over the § 510 provisions." ROA.14429. The bankruptcy court also stated it "must give effect to the specific provisions governing assumption"—with the implication being that the assumption provisions trump and the Section 510(b) cancelation and release provision is given no effect. ROA.14429. That approach defies numerous principles of contract interpretation. *See In re MPF Holdings US LLC*, 701 F.3d 449, 457 (5th Cir. 2012)

[11] Even if the Insurers had tendered the policy limits before bankruptcy to settle the Securities Lawsuits, their claim still would have been subject to subordination or disallowance despite section 509 of the Bankruptcy Code. *See* 11 U.S.C. § 509. As a prepayment incident to securities fraud claims, it was subordinated.

("[C]ourts regularly apply principles of contract interpretation to clarify the meaning of the language in reorganization plans.").

Courts must "give each provision and term effect, so as not to render any part of the contract mere surplusage." *Osborn*, 991 A.2d at 1159. Similarly, "where a contract provision lends itself to two interpretations, a court will . . . adopt the construction that . . . harmonizes the affected contract provisions." *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010). For example, the Delaware Supreme Court held that the interpretation of certain paragraphs of an agreement was "compelled . . . by the canon of construction that requires all contract provisions to be harmonized and given effect where possible" and refused to adopt an interpretation that would "violate the 'cardinal rule'" that "a court should give effect to *all* contract provisions." *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1221, 1225 (Del. 2012) (citation omitted).

Here, the assumption provision exists in harmony with the Section 510(b) cancelation and release provision: the assumption saves Bennett and Grubb's indemnification claims from being barred to the extent consistent with applicable law, while the Section 510(b) cancelation and release bars the Insurers' separate Claim for reimbursement and relegates it to proper treatment under the Bankruptcy Code. *See* ROA.7287, 7277. Thus, both provisions can be given effect without

conflict. That harmonious interpretation should prevail over the Insurers' and bankruptcy court's approach of refusing to give the Section 510(b) cancelation and release provision effect.

The bankruptcy court referenced the specificity of the assumption provision, but any such specificity is not proper basis for refusing to give the Section 510(b) cancelation and release provision effect. Under the specific-general principle of contract interpretation, a specific provision controls over a general one only if they pertain to the same subject matter and conflict. *Barnard*, 457 F.3d at 429; *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 862 (Del. 2008); *In re TransPerfect Glob., Inc.*, 2021 WL 1711797, at *44 (Del. Ch. Apr. 30, 2021) (quoting *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *9 (Del. Ch. Nov. 30, 2017). The assumption provision and the Section 510(b) cancelation and release provision pertain to different subjects: the assumption provision pertains to indemnification obligations to D&Os such as Bennett and Grubb, while the cancelation and release provision pertains to Section 510(b) Claims. ROA.7287, 7277. Neither is more specific than the other. Moreover, as explained above, they do not conflict. The specific-general principle of contract interpretation thus has no bearing on this point. The Section 510(b) provision should be given effect by holding it canceled and released the Insurers' Section 510(b)

Claim, which still leaves the assumption of the indemnification obligations to Bennett and Grubb intact.

In arguing otherwise, the Insurers are blatantly trying to jump to the front of the bankruptcy distribution line, ahead of other creditors. *See* ROA.6698-99, 6705. Such an end-run around Congress' mandatory priority scheme in Section 510(b) should not be permitted. Allowing the Insurers to bypass the Plan's cancelation and release of their claim here would open the door for other insurance companies to bypass other bankruptcy plans' treatment of their claims, exposing debtors to post-bankruptcy liabilities never contemplated.

The Court should hold that the Plan bars the Insurers' Claim as a matter of law because it is canceled and released as a Section 510(b) Claim.

### C. Because the Plan bars the Insurers' Claim, the bankruptcy court should have reopened the bankruptcy case to enforce the Plan.

As explained above, because the Plan bars the Insurers' Claim as a matter of law, cause exists for reopening the bankruptcy case to enforce the Plan against the Insurers. *Supra* Argument Part I.D. The bankruptcy court erred in refusing to do so. This Court should reverse and prohibit the Insurers from pursuing their claim—either because it was discharged and enjoined and no exception for assumption applies (Argument Part I), or because it was canceled and released as a Section 510(b) Claim (Argument Part II).

## III. Alternatively, if the bankruptcy case is not reopened to enforce the Plan against the Insurers, SandRidge should be able to assert all its arguments in the Oklahoma State Case.

Alternatively, if the bankruptcy case is not reopened to enforce the Plan against the Insurers, SandRidge should be able to assert all its arguments in this federal court appeal in the Oklahoma State Case, without exposure to allegations of contempt for violating the Gatekeeping Order. Allowing SandRidge to do so would align with the district court's opinion, which states that a "decision not to reopen the Bankruptcy case does not impact the rights of the parties to resolve their differences in the Oklahoma case" and seems to hold that any analysis of the merits of Plan enforcement is irrelevant if the bankruptcy case is not reopened. ROA.15546.

Despite the district court's opinion that endorses SandRidge's continued defense against the Insurers' Claim in the Oklahoma State Case, the bankruptcy court's Gatekeeping Order remains in place, which directs the parties to return to the bankruptcy court for disputes over Plan violation and enforcement. ROA.10371. SandRidge complied with the Gatekeeping Order by seeking to enforce the Plan in the bankruptcy court in the first instance. Therefore, if the Court affirms the decision not to reopen the bankruptcy case to enforce the Plan, then SandRidge respectfully requests that this Court clarify and hold that SandRidge is allowed to assert all its

arguments in this federal court appeal in the Oklahoma State Case, without any further imposition of the Gatekeeping Order.

## CONCLUSION

SandRidge requests that this Court (1) reverse the bankruptcy court's denial of the motion to reopen the bankruptcy case and motion to enforce the Plan, (2) reverse the district court's affirmance, and (3) render judgment that the Insurers' Claim is discharged, enjoined, canceled, and/or released and, therefore, the Insurers are prohibited from pursuing the Insurers' Claim and no recovery thereon is permitted.

Alternatively, if the Court affirms the decision not to reopen the bankruptcy case to enforce the Plan, SandRidge requests that the Court enter an order clarifying that SandRidge is allowed to assert all its arguments in this federal court appeal in the Oklahoma State Case.

SandRidge also requests any further relief to which it is entitled.

Dated: May 26, 2026

Respectfully submitted,

**HAYNES AND BOONE, LLP**

*/s/ Patrick L. Hughes*
Patrick L. Hughes
Natasha Breaux
Shayna G. Proler
1221 McKinney St., Ste. 4000
Houston, Texas 77010
(713) 547-2000
patrick.hughes@haynesboone.com
natasha.breaux@haynesboone.com
shayna.proler@haynesboone.com

David P. Bender, Jr.
Martha Wyrick
6000 Headquarters Dr., Ste. 200
Plano, Texas 75024
(972) 739-6900
david.bender@haynesboone.com
martha.wyrick@haynesboone.com

**Counsel for Appellant**
**SandRidge Energy, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of May, 2026, I electronically transmitted the foregoing document to the Clerk of the Court of the 5th Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Patrick L. Hughes*
Patrick L. Hughes

## ECF CERTIFICATION

I hereby certify that (i) the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Symantec Endpoint Protection active scan and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, per 5th Cir. R. 25.2.9.

*/s/ Patrick L. Hughes*
Patrick L. Hughes

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

■ this brief contains 12,966 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

■ this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Equity font.

*<u>/s/ Patrick L. Hughes</u>*
Patrick L. Hughes